IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | ORDER ON RESTITUTION |
| v. | 14-cr-22-jdp |
| DAVID WEIMERT, | |
| Defendant. | |

---

Defendant David Weimert was convicted after a jury trial of five counts of wire fraud, for which I sentenced him to 18 months incarceration, three years of supervised release, a $25,000 fine, the mandatory $500 criminal penalty assessment, and restitution in an amount to be determined. The government seeks three amounts as restitution: the commission paid to Weimert by his employer in the amount of $311,680; the value of the 4-7/8% ownership interest in Chandler Creek Limited Partnership, which Weimert acquired as part of the sale of that partnership interest; and investigation costs in the amount of $111,929.40. Based on the submissions of the parties, the evidence and argument presented at the restitution hearing, and the entire record, I will order restitution as follows.

FACTS

I find these facts to be established by a preponderance of the evidence.

Weimert was vice president of Anchor Bank, fsb, and president of Investment Directions Incorporated (IDI), a subsidiary of Anchor Bank's holding company. IDI's business was essentially investing bank funds in real estate. Late in 2008, Weimert's superiors at Anchor Bank directed him to raise cash by selling IDI's real estate investments,

including particularly its non-controlling 50% interest in Chandler Creek Limited Partnership, which owned a commercial real estate development in Austin, Texas. The other 50%, with controlling authority and responsibility for actively managing the development, was owned by Burke Chandler Creek II, LLC, a company owned and controlled by William B. and Brian R. Burke, father and son. For simplicity in this order, I will refer to the owner of the controlling 50% interest as "the Burkes." The Burkes held a right of first refusal to IDI's interest, which meant that if IDI wanted to sell and had a buyer, the Burkes had the right to purchase the interest if they matched the monetary terms of the competing offer.

With the deepening of the financial crisis, the end of 2008 was a bad time to try to sell real estate, and the non-controlling interest in the Chandler Creek partnership was illiquid, and therefore particularly difficult to sell. Although the Burkes were in some sense the "natural" candidates to buy out IDI's interest, they were not especially interested in investing more in Chandler Creek. But Weimert was able to induce them to buy out the IDI interest by soliciting a so-called "stalking horse" bid from a New York-based real estate investor, Nachum Kalka and Mr. Kalka's minority partner. Weimert solicited the Kalka bid in hopes of goading the reluctant Burkes into matching the offer, but Kalka made a genuine bid that he expected to be successful.

There is no formal valuation of IDI's interest in the record. IDI maintained the Chandler Creek interest on its books at a value of $6,000,000, and IDI was willing to sell the interest for that amount. Weimert did a "quick snapshot" of the value of the Chandler Creek property, estimating that it might grow to be worth as much as $35 million. Gov. Trial Ex. 7-1; Dkt. 122-1. This calculation was not based on any formal appraisal and its purpose was mostly to pitch the property in rosy terms that made it appealing to buyers. Weimert did a

2

further calculation in which he estimated that IDI's 50% interest in the property would provide an attractive return to an investor who purchased that interest for about $8 million, and it was this valuation that he pitched to Kalka and to the Burkes. Again, this valuation was based not on any formal appraisal, but on Weimert's sense of the highest that he could plausibly ask.

Ultimately, Weimert persuaded Kalka to submit a letter of intent offering $8.5 million for IDI's 50% share of the property. The letter of intent also included a term that gave Weimert, personally, a 4-7/8% interest in the property. Using the Kalka letter of intent, Weimert successfully induced the Burkes to exercise their right of first refusal to (nearly) match the Kalka offer. The Burkes did not want IDI to sell its interest to Kalka because they regarded Kalka as a difficult partner, a "vulture" after a quick profit, rather than one with a long-term interest in the property. The Burkes offered slightly less money—$8 million—but they matched the non-monetary terms of the Kalka offer, including that Weimert would take a 4-7/8% ownership interest in the Chandler Creek partnership.

In presenting the deal to IDI, Weimert also asked IDI to pay him a four percent bonus for putting together a successful deal in a difficult environment. He also told IDI that he needed $100,000 to fund his buy-in for the 4-7/8% ownership interest, and Weimert said that he would like an additional $100,000, which he would use to pay off a promissory note to Anchor Bank. The four percent bonus was enough to cover the taxes so that he would net roughly $200,000. The IDI board had misgivings about the apparent conflict of interest in having Weimert act as both an employee of the seller of the Chandler Creek interest and as a buyer of an interest in Chandler Creek. But, after seeking the advice of counsel, the IDI board agreed to waive any objection to the conflict of interest, and it agreed to the deal that

3

Weimert had put together. That deal included IDI paying a bonus to Weimert of $311,680 and transferring to Weimert a 4-7/8% interest in Chandler Creek, with the remaining 45-1/8% interest going to the Burkes.

Weimert's involvement in the transaction concluded after IDI decided to accept the Burkes' proposal. IDI's attorneys eventually restructured the deal to provide that IDI's 50% interest in Chandler Creek would be transferred to the Burkes. The transfer was subject to the condition that the Burkes would transfer a 4-7/8% interest to Weimert, pursuant to a separate "contribution agreement," under which Weimert would pay $100,000 to Chandler Creek partnership. That $100,000 remains in Weimert's capital account held by the partnership. In addition, Anchor Bank financed the majority of the purchase price, $6,233,000, at an interest rate somewhat higher than had been charged by the previous lender that held a mortgage on the property. The purchase price was $7,792,000.

Anchor Bank and its related companies had been the target of an investigation into certain activities involving the use of TARP funds during the financial crisis, including Weimert's involvement in the Chandler Creek transaction. IDI, Anchor Bank, and Anchor Bank's holding company were represented during this investigation by the law firm of Michael Best & Friedrich. The investigation led to seven grand jury subpoenas, most of which did not concern Weimert. Anchor Bank provided the U.S. Attorney with a compilation of legal fees that it contended were expended solely in connection with the Weimert investigation and prosecution, and not the other subpoenas. I find that, with the minor exceptions noted below, the Michael Best & Friedrich legal fees were reasonably incurred in connection with the investigation and prosecution of Weimert's crimes.

ANALYSIS

Weimert was convicted of offenses of fraud or deceit, which makes his conviction subject to the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A. The overriding purpose of the MVRA is to "compensate victims for their losses." *United States v. Pescatore*, 637 F.3d 128, 138 (2d Cir. 2011). The basic idea is to make the crime victim whole, fully compensating the victim for its direct losses. In this case, compensating the victims will require Weimert to repay IDI's monetary loss, relinquish his interest in the Chandler Creek partnership, and pay the expenses that Anchor Bank incurred as a result of the investigation into Weimert's fraud.

**A. Direct monetary loss**

I begin with the direct monetary loss to IDI, which is reasonably straightforward. The starting point is the four percent commission paid to Weimert in the amount of $311,680. However, Weimert had to pay $100,000 of this amount as a required contribution for the 4-7/8% interest that he acquired in the Chandler Creek partnership. For reasons explained below, I will order that Weimert relinquish his interest in Chandler Creek to IDI. Accordingly, the $100,000 in Weimert's capital account will, in that form, be returned to IDI. I will not double count that sum by including it in the direct monetary loss. Accordingly, the monetary loss component of Weimert's restitution payment is $211,680.

**B. The 4-7/8% interest in the Chandler Creek partnership**

I turn next to the 4-7/8% ownership interest that Weimert acquired as a result of his fraud. Under 18 U.S.C. § 3663A,

> (b) The order of restitution shall require that such defendant—

5

> (1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—
>
>> (A) return the property to the owner of the property or someone designated by the owner; or
>>
>> (B) if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to—
>>
>>> (i) the greater of—
>>>
>>>> (I) the value of the property on the date of the damage, loss, or destruction; or
>>>>
>>>> (II) the value of the property on the date of sentencing, less
>>>
>>> (ii) the value (as of the date the property is returned) of any part of the property that is returned.

Following the logic of the statute, the first question is whether this is a case in which the offense caused damage or loss to IDI's property. I conclude that it is such a case, a point the government apparently does not dispute, because it cited 18 U.S.C. § 3663A(b)(1) as the basis for this component of restitution. Dkt. 117, at 1. In the transaction as it was set up by Weimert and accepted by IDI, there was to be one unified transaction in which IDI, in exchange for the payment from the Burkes, would transfer to the Burkes a 45-1/8% interest in the Chandler Creek partnership and transfer to Weimert the other 4-7/8% interest. The transaction was restructured by IDI for its own purposes after Weimert's involvement had ceased. IDI chose to structure the deal as one in which it transferred its full 50% to the Burkes, and then, by means of a separate document executed contemporaneously with the rest of the deal, the Burkes assigned a 4-7/8% interest in the Chandler Creek partnership to

6

Weimert. Thus, in the deal put together by Weimert and accepted by IDI, IDI was deprived of property, not cash.

This is not like a typical mortgage fraud case such as that in *United States v. Robers*, 698 F.3d 937 (7th Cir. 2012), *aff'd*, 134 S. Ct. 1854 (2014). In that case, the Seventh Circuit distinguished between the collateral that was used to secure the funds provided by a bank and the funds themselves. 698 F.3d at 942-43. In a mortgage fraud case, the bank is defrauded of cash, not the real property put up as collateral for the loan. The collateral might be used to offset the loss to the victim-lender, but the loss itself is monetary. In this case, however, the deal as set up by Weimert deprived IDI of property: the 4-7/8% interest in Chandler Creek.

The next question, again following the logic of the statute, is whether the return of the property is "impossible, impracticable or inadequate." The government's memorandum concerning restitution sought either the return of the Chandler Creek interest or payment of the value of that interest. Dkt. 117, at 2-4. However, at the restitution hearing, the government indicated that IDI and Anchor Bank do not want the property back; they want the money. I will construe this change in position as an argument that the return of the property is inadequate restitution (the return of the interest is neither impossible nor impracticable; indeed, Weimert is agreeable to it. Dkt. 130, at 6.).

The government's argument that the return of the property would be inadequate is based essentially on the idea that a 4-7/8% interest in Chandler Creek was worth a lot at the time of the loss (March 2009), but that same interest is worth next to nothing now. The government contends that Weimert, not the victims, should bear the market loss. I am not persuaded.

7

The burden is on the government to prove the restitution amount. *United States v. Allen*, 529 F.3d 390, 396 (7th Cir. 2008). The relevant amount for restitution is the actual loss to the victims, not the loss intended by the defendant, which is relevant to calculating the loss amount under the sentencing guidelines. *Id*. at 397. The government's evidence does not support its contentions about either the current value of the partnership interest or its value in March 2009.

The government's evidence of the current value of the 4-7/8% interest in Chandler Creek is based on Brian Burke's statements that he does not regard the 4-7/8% interest as having *any* value. But there are good reasons to doubt Brian Burke's testimony on this point. First, since the Weimert investigation, the Burkes have refused to pay on the loan to Anchor Bank on the grounds that they were somehow misled in the transaction. Thus, Brian Burke is highly motivated to undervalue the Chandler Creek partnership. Second, Brian Burke's statements to the FBI are somewhat unclear because the basis for his valuation is unclear. Brian Burke told the FBI in 2010 that "We do have equity in it, but it is not cash flowing." Dkt. 122-3, at 12. It appears that Brian Burke's valuation is based on the fact that the Chandler Creek partnership was not producing income. But this ignores its value as an asset that might at some point be sold. Third, testimony from 2010 is stale. Even if the prospects of Chandler Creek did not look promising in 2010, by 2015, after a significant recovery in the economy, they may have turned around. In sum, the Chandler Creek development has significant land and improvements in an area near Austin, Texas, and the idea that a 4-7/8% interest in the partnership that owns that development has literally no value is implausible.

The government's valuation of the interest in March 2009 is apparently based on simple arithmetic, but it rests on a flawed assumption. If the Burkes paid $7,792,000 for a

8

45-1/8% interest, prorating that price produces a value of $841,795.02 for a 4-7/8% interest. The government's theory is based on the assumption that had Weimert not written himself into the Chandler Creek transaction, the Burkes would have paid another $841,795.02 for IDI's interest. But this assumption is not supported by the record. The Burkes were reluctant purchasers. They were induced to buy out IDI's interest by the competitive bid that Weimert solicited, and it is doubtful that the Burkes would have been willing pay nearly $1,000,000 more than they did. Brian Burke's opinion that the 4-7/8% interest is now a negligible part of their investment is inconsistent with the government's assumption that Weimert's share was once nearly a million dollars out of an eight million dollar transaction.

 Even if I were to conclude that the victims were entitled to recover the monetary value of Weimert's interest in the Chandler Creek partnership at the time of the loss, I would conclude that the government has failed to sustain its burden to show the value of that interest. I find it particularly telling that the government did not elicit any testimony from Brian Burke that he would have paid any more for the Chandler Creek interest in 2009. Nor has the government provided any independent appraisal of the Chandler Creek property as of March 2009. Finally, the government did not put in any evidence of the terms under which Weimert's interest would or could be redeemed. At trial, Weimert testified that he considered the ability to acquire a 4-7/8% interest in Chandler Creek for a contribution of $100,000 to be a good deal, but that falls far short of establishing the actual fair market value of the 4-7/8% interest as of March 2009.

 I conclude that Weimert's fraud deprived IDI of property, namely, the 4-7/8% interest in the Chandler Creek partnership. I further conclude that the government has not shown that the return of the property is impossible, impracticable, or inadequate. Under the

9

circumstances of this case, I find it to be fair to Weimert and to the victims to return the property to IDI. Accordingly, pursuant to 18 U.S.C. § 3663A(b)(1), I will order that Weimert relinquish his interest in the Chandler Creek partnership, including his interest in his capital account, to IDI or another entity as directed by IDI.

## C. Investigation expense

Restitution properly includes "other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). The government submitted a summary of the attorney fees incurred on behalf of Anchor Bank and its affiliates in connection with the investigation and prosecution of the Weimert case.

The review of these fees was complicated by Anchor Bank's assertion of privilege, which I have overruled. The summary was originally provided in a highly redacted form that included only the date, timekeeper, hours, and total dollars of each entry on the bills from Michael Best & Friedrich. In response to Weimert's objection, Anchor Bank provided a version that included some narrative descriptions of the work, which permitted some review of the requested fees. Dkt. 125-1. At the restitution hearing, the government presented the testimony of Daniel J. Vaccaro, a partner at Michael Best & Friedrich, who testified that all of the entries in this later breakdown of fees were incurred in connection with the Weimert matter and not in the response to unrelated grand jury subpoenas. The defense challenged Mr. Vaccaro's testimony and the exhibit primarily because Dkt. 125-1 was still highly redacted. Based on my *in-camera* review of an unredacted version of Dkt. 125-1, I concluded that none of the redactions included attorney-client communication or attorney work product. The redacted portions included only the topics of conversations with Anchor Bank

employees, Anchor Bank management, or Anchor Bank's other attorneys, which is the type of information that would be a required disclosure on a privilege log. The redactions did not include any legal advice provided by Michael Best & Friedrich attorneys, nor did that information even remotely reveal attorneys' thoughts and litigation strategy. Accordingly, the unredacted version of the document, Dkt. 145-1, was provided to defense counsel for review.

I confirm my ruling at the hearing that all the entries are related to the Weimert matter, with two exceptions. The entries for work by Mr. Vaccaro on August 23, 2013 ($540), and on September 3, 2013 ($675), involved work that was generally directed toward grand jury compliance and IDI's consideration of a privilege waiver. Because the descriptions could apply to non-Weimert grand jury subpoenas, I will disallow these two entries as items of restitution. Accordingly, I find that the cost to the victims of investigating and participating in the prosecution of the Weimert case is $110,835.90.

Finally, I conclude that the payment schedule proposed by Weimert is reasonable. Dkt. 130, at 6-7 and Dkt. 130-4. However, in light of the restitution amount, and for simplicity, I will order that the restitution amount be paid in fully by October 31, 2015, a date by which it appears that Mr. Weimert will have funds available.

ORDER

IT IS ORDERED that:

1. Defendant David Weimert is required to pay monetary restitution in the amount of $322,515.90, payable in full by October 31, 2015.

2. Defendant is required to relinquish his entire interest in Chandler Creek Limited Partnership, including all amounts held in any account for David Weimert by Chandler Creek Limited Partnership, to Investment Directions Incorporated, or to any entity designated by Investment Directions Incorporated.

Entered August 4, 2015.

                                          BY THE COURT:

                                          /s/

                                          _____
                                          JAMES D. PETERSON
                                          District Judge